Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice John Griffin presiding, case number 1-9-1-5-7-8 and Duggan versus Symphony Cresswood. Okay, welcome. I would ask the attorneys who are going to be arguing to please state your name and spell your last name for us. Good afternoon, Your Honors. I'm Scott Howey, H-O-W-I-E, on behalf of the defendant Appellant Symphony Cresswood. Thanks. Good afternoon, Your Honors. Mike Bonamart, B as in boy, O as in Nancy, A-M-A-R-T-E, on behalf of the plaintiff Appellee, and Duggan for her brother Stephen Duggan. Great, well welcome again. You know you each have 20 minutes. Mr. Howey, do you want to reserve any time? Yes, Your Honor. I'd like to reserve three minutes, please. And if we have trouble getting people's attention with the Zoom, we'll be waving our hands or something like that so we can all try to. Before we get started, just what is the status? Is Mr. Duggan still living in the symphony facility? Yes, Your Honor, and he's still on the waiting list at Holy Family, to my knowledge. Okay, all right. Thank you. Mr. Howey? Thank you, Your Honor. Good afternoon, and may I please the court. Again, for the record, I'm Scott Howey, representing the defendant Appellant, Symphony Crestwood, LLC. This case began as a dispute under the Nursing Home Care Act, but while the merits of that dispute have been settled, the terms of the settlement are now in dispute. The circuit court summarily ruled for the plaintiff in that dispute without an evidentiary hearing and without giving Symphony a meaningful opportunity to set forth its own understanding of the disputed settlement or to challenge the plaintiffs. The record shows... Where in the record does it show that you asked for an evidentiary hearing? The trial counsel did request additional time to brief the original motion to enforce the settlement that was ruled upon at its first presentation at a time coming as quite a surprise to trial counsel. But wait, you just said more briefing. I said, where in the record did he ask for an evidentiary hearing? The record doesn't disclose a request for an evidentiary hearing. So you're conceding there is no request in the record for the defendant to have an evidentiary hearing. Is that correct? There was no request in the record? There's no express request for that, Your Honor. That means there was no request. I mean, it's not silent. I mean, how else does he do it? Fair enough, Your Honor, but regardless of whether there was a request, the fact that there was no evidentiary hearing has important implications for the court's standard of review. And what the record... Wait, wait, wait. I want to stop you there. How can we review the June 10th hearing when there's no transcript of the June 10th hearing in the record? Well, the hearing isn't what the court would be reviewing. The order that was entered that day enforcing the plaintiff's understanding of the settlement agreement is what's under review. We don't know what happened. The judge heard something because we know from the transcripts from the following, the reconsideration motion, that there was something before the court on June 10th, and there were some arguments, there was some discussion. We know that from the discussion a couple weeks later. So we don't have any transcript. I'm correct, right? There's no transcript from June 10th. That's correct, Your Honor. How can we review this when we are a court of review? All we have is an order. We have to assume that the court had proper information before him when he entered that order. Well, what the court does have before it is the motion that was filed, the exhibits to that motion, and the representations made in the subsequent appearance before the court on the motion to reconsider, none of which are in dispute. And there isn't any dispute that what took place at the June 10th appearance was not an undertaking of evidence. The court does know that. And that fact is what goes to dictate the standard of review here, which is that the court has a de novo standard, only seeing what is in the record, and that is the motion and the exhibits to it, as well as the subsequent motion to reconsider and the exhibits to that, and the transcript of the appearance before the court in relation to that. The fact that there was no evidentiary hearing has those implications for the standard of review because this court has exactly what the circuit court had before it, no more no less, and that makes the non-deferential de novo standard appropriate. And the record shows that the transfer to another facility prior to payment was material to Symphony's So, the settlement was agreed to on August 1st, 2018, correct? That's correct. And the parties arrived at that agreement, there's no question about that, it was arrived at on August 1st. My question is, was it arrived at on August 1st? I think it's more that the parties believed they had agreed. Oh no, it's not what they believed. Let me read to you the attorney for the defendant in the transcript on June, on the June rehearing. It's not equivocal at all. It says that, first it says that the, in plainness, Mr. Marty himself is aware of it, the parties occurred initially back in March of 2018 and that was between McCabe and Black, correct? That's correct. Okay, and so then on that date, this is what the court was told, there was the initial attempt to initiate settlement negotiations, and at that point in time, Ms. McCabe advised Ms. Black that any settlement would be contingent upon Mr. Dugan discharging himself from the facility voluntarily, is that correct? Correct. Okay, that is the only mention of that aspect of the settlement negotiations until after the settlement was reached on August 1st, 2018. You agree to that? Correct. Okay, so now let's look at what is referred to as exhibit, it's exhibit C, and one of the attachments, one of the exhibits to the material before the judge, and it's from Peggy McCabe to Margaret Batsby Black, March 26, 2018, and that's the reference of the Ms. McCabe advising Ms. Black about the settlement, correct? It's the March 26 email. I believe that's correct, yes. Okay, and what she says is, hi Margaret, on Dugan, because there were a lot of cases apparently between the offices, he is still on the facility. Would the family agree to a voluntary discharge to another facility? That asks for an agreement, and in the next time there is, we know there's an agreement on August 1st, and there was nothing else said about that, therefore, you know, if you have a settlement for $250,000, which is not mentioned here at all, then I don't understand what we're talking about, about this voluntary. There was a request. That was a request, and it said that it's not mentioned again until after the settlement on August 1st. Therefore, by your own admissions in the transcript we have and the exhibits, it agreement, I'm that. Where is it if it's there? As the events that took place after August 1st reveal, your honor, there is, for instance, the drafting of written settlement agreements, which did include language regarding not just the the agreement to transfer Mr. Dugan, but also the timing of that piece of payment. No, but that was after the case was dismissed, correct? That's correct, and that's what that's what reveals that the parties believed that they had agreed to a settlement and believed that they had agreed on its terms, an agreement that proved not to be the case. We know that there's an admission before Judge Flannery, it was settled on August 1st, and the only, and there was an admission that the only discussion was this email from McCabe saying, would you agree? And there's nothing in the record, there's nothing to substantiate that they agreed to anything about that. So, you know, what the judge did, we don't know what the judge did on June 10th because we don't have a transcript. So here you're asking us to, to what, review the facts again? We don't do that. What we're looking, not to review the facts, your honor, certainly not. This is a review of what's in the record, and the record is sufficient to, to demonstrate that the parties, while only initially speaking in terms of an agreement, did continue to act, act consistently with that. Bear in mind that there is no executed written settlement agreement. The one that is in the record is one that was drafted, it has never been executed, and so of course it's not the binding agreement itself, but it does reflect what Symphony's understanding of the settlement agreement was, an understanding which apparently diverged from what the plaintiff felt. Well maybe it was in her own mind because she asked only whether they would agree, and there is nothing, and you would agree there is nothing in writing from the plaintiff, no document reflects at all that there was an agreement that he'd be out before the payment, is there? I mean, I didn't go that far, your honor. There is not an express, explicit statement to that effect, but the party's conduct is relevant to this as well, and it's clear that during the entire time that this, that settlement discussions were going on, that the parties were working, primarily Symphony was working to find an alternate placement. Actually did find an alternate placement for him, which the plaintiff rejected. Continued search for placement at the, the alternate locations that the plaintiff had proposed, and didn't find any room in any of those, and continued still to look for another location, again, in constant contact with the plaintiff's counsel, and so while it's true that the record doesn't show a specific agreement to that effect, something that would be in, for instance, an executed settlement, it does reflect the understanding by Symphony at all times that this was going to be part of the agreement, then, then the parties didn't have a meeting of the minds as to that critical term. The record does further show that it was material to Symphony, that this particular, that these particular events happen in a particular sequence, and that Mr. Dugan would have to be transferred before Symphony would be required to, to make the payment. Can I just ask a quick question here. Now, the, the, both sides wanted Mr. Dugan to move, right? I can only speak for Symphony, but, and it's my... From the emails, it's clear that both sides were, were in agreement to, that he'd move, and the, are you saying that the In other words, was there no agreement till he moved, or was the agreement that there was no payment till he moved? Certainly the settlement was contingent on his moving, and the payment, I suppose you could put it that way, that it was contingent on his moving, but certainly the payment, the move had to happen before the payment would be made, and that is, that is only consistent with the way in which a settlement of this type would have to work. The, the, it would require that Mr. Dugan, or the plaintiff in this case, not only voluntarily dismiss the action, but voluntarily transfer it to another location. Why is that, wait, what, you say that, that's, that, why is it required? I don't understand, there's no law, there's no statute, there's, I don't understand that statement. Understood, Your Honor, but consider the, the sequence as it would occur in the other direction. There would be no, no incentive for the plaintiff to, to then move with any promptness, or even to move at all once the payment had been made. Couldn't there have been some negotiation, like, you know, we'll pay you half now, and half after you move, or so you, if you're just looking for an incentive to, to settle the case, tell the court the case is settled, but we're not paying until some indefinite time. Does that make sense? It's, it isn't necessarily the way in hindsight we might have done it, but given that that is the facts that were presented with, it's not out of order to, to consider the case dismissed, which the court did, in fact do, and, and then to have the, the, the parties comply with their obligations subsequent to that. Bear in mind... With regard to him moving, look, $250,000 is not insubstantial, and of course, it was a facility where something happened to him that resulted in a settlement of $250,000. It would be reasonable to expect that he'd want to move out, and that's why there are, throughout the record, emails about him doing so. They have to find a facility, and it has to be in a facility that would accept him, and, and for reasons outside of everybody's control, there was none, but there was one where he was on a waiting list, which goes to the question that was asked whether, at the beginning of the case, again, you say, you know, I don't see why the payment couldn't have been made, and continued to be looking... In fact, they told you, we're on a waiting list. As soon as we can, we're number one, we can, he'll be out of there. Well, you can't put him on the street. That would be against the law. That's true, Your Honor, and, and I want to emphasize, there is no effort by Symphony to put him out on the street or turn him out without a place to go. The record doesn't support any suggestion in that regard at all. Symphony has worked diligently at all times to locate a suitable facility for him to go to. Would you say the other side worked diligently as well? I think the bulk of the work is reflected in the record, is done by Symphony. It's Symphony that looked for locations, it's Symphony that found locations, and even arranged for a tour of one of them, which the plaintiff evidently did not take. Why did the plaintiff, the record tells us why, you know why the plaintiff didn't take that particular one, don't you? I don't know why, and the record doesn't reflect why the plaintiff didn't accept it. Is that the facility where the plaintiff had left after a day? That's the first one, that is Chicago Ridge, that the reason given was that they had a bad experience after a day there, some 12 years earlier. We're not questioning that the plaintiff had, had a reason. We might debate whether the validity or the value of that reason, but the plaintiff stated some reason for that rejection. The second facility, after Symphony looked into the other five locations that the plaintiff proposed and found no room in any of them, the Symphony continued looking and found another location at at the Alden Heather facility, and the record only shows the plaintiff's counsel's account that the plaintiff looked into it, that's as much as it said, and doesn't want to agree. So that's all we know from the record. Would they have to take anything, any facility that will take him they have to go to? That wasn't the agreement, was it? Well, even the plaintiff would agree that at a very minimum, the agreement required the plaintiff to be reasonable in effectuating his transfer, and without knowing any reasons for rejecting an available space that Symphony believes to be comparable, we can't know if that was a reasonable rejection, and without knowing if it's reasonable, we also can't know whether the plaintiff will in fact be moving or transferring Mr. Dugan at a time when something becomes available. We have a statement, a promise that she will, but we don't have any, any leverage in enforcing that promise if the plaintiff were to say that she will. I only stress that that is, it's a possibility that Symphony can't afford to overlook, and if the plaintiff were to, at some point, for whatever reason, good or bad, to refuse to transfer Mr. Dugan, or to take what we would believe to be an inappropriate amount of time in doing so, we wouldn't have any way of compelling that performance. That's distinct from what the plaintiff would have if she were to transfer Mr. Dugan, and then for some reason, if Symphony were to back down on its promise, which I can assure you it won't do, but if it were to renege on the agreement, the plaintiff would have recourse. Symphony, by contrast, wouldn't have any way of forcing Mr. Dugan to leave its premises if the plaintiff refused to transfer him, nor would it wish to, for that matter, given the business that it's in and the care that it provides. I gave a sample where they retained some money. I mean, I just didn't see any negotiations. I didn't see any, that this was a critical issue in the negotiations. Why not just say, hey, you don't get all your money till you move, but you get half of it, or two-thirds, or whatever. And I don't deny there would have been other ways to do it, but we do have the situation as it's presented to this court. We do know that the parties were working to get Mr. Dugan transferred. I think it's significant that the Plaintiff's Counsel did appear to be working in concert, or at least not objecting to the efforts that Symphony was making to move Mr. Dugan. He was acting reasonably, according to him. Anyway, we're pretty much out of time for you. Do you want to finish, or anything? May I ask one question, Judge Griffin? Sure. Mr. Howey, is it your position that if the Plaintiff died this afternoon, because he didn't move out, his estate would not be entitled to the money? I can't speak for Symphony without conferring. I can say with some certainty, I believe, Your Honor, that that would be a change in circumstances sufficient to likely consider, to force Symphony to reconsider its position on that term. I think that's a fairly extreme circumstance that certainly we all hope does not come to pass. If he would have died in the last two years, would it be Symphony's position that, well, because he didn't move out, we don't owe him anything. We never settled the case, because it was a critical part of the settlement that he moved. I mean, he doesn't want to be there. You don't want him. He got injured. You agreed that he got, something happened that required a settlement, a meeting of the minds. Money is the issue. Now what? He's not entitled to it because he never left? I mean, it just doesn't, it really smacks of unfairness. For the record, Your Honor, I would start by observing that the settlement doesn't reflect Symphony's agreement that anything happened in Estradurian. It's a way of resolving a dispute, and there's no admissions required of any party. Well, correct. I understand that. But more to the point of your question, does he walk away from the payment if he dies while we're on the Zoom argument? I think, Your Honor, I don't wish to be flippant on this subject. I think that if Mr. Duggan were to die, he would be leaving the facility in a certain fashion, and I think any court would interpret the with or without a hearing. But that would be, there would be a circumstance in which he would be, I think, in a very real sense departing the facility. At a minimum, it would be a change in circumstances sufficient that I suspect the issues before us would be mooted, and that would not be a concern. The fact is, however, it is likely to take longer than the plaintiff wants to wait before being paid, and it's going to take longer than Symphony ought to have to wait after making the payment. And we can all certainly hope that events moot this, events other than the untimely death of Mr. Duggan, which none of us hoped for, that other events would make this no longer a controversy before the court. But for the time being, it is. And Symphony has no desire to undo the settlement or to back out of it, but its agreement with the plaintiff necessarily included certain events in a certain sequence, and the version of the settlement forced on it by the circuit court does not reflect that agreement. Symphony therefore respectfully urges this court to reverse and vacate the order enforcing that version of the settlement agreement. Thanks. Mr. Bormer? Yes, Your Honors. I think the court has hit the main questions and issues on the head. The question really is whether this settlement or payment of the settlement was contingent on him moving out, and there is nothing in writing. And by the appellant's own admission, there was a settlement on August 1st of 2018. And what is happening right now is exactly why I would never agree to something like this. Number one, it does contravene public policy. We filed a lawsuit under the Nursing Home Care Act, which is a private attorney's general statute that encourages residents and their loved ones to bring these types of cases. Now, in some form of you have to get out of the facility before we pay. That directly contravenes the intent of the Nursing Home Care Act. Number two, it is clear that we have been reasonable in our efforts to find alternative placements, because that's what I said I would do. That's what's reflected in the emails after the settlement was reached. And we provided a list of five different facilities, one of which he's on the waiting list for. But I think the timing and the sequence of events is important. We've got a settlement reached, and it's not disputed by either side on August 1st. We have court on August 3rd that sets the next hearing for a status on the plaintiff's settlement petition. And fast-forwarding, we have five or six court appearances after August 3rd, including five of them, when apparently the defendant is now refusing or the appellant is refusing to pay the settlement until he moves out, where they don't bring it up. It's still clear that there is a settlement and the court's just waiting on a petition. And then on March 4th, when Mr. Dugan is put on the waiting list for Holy Family, one of the five facilities that her brother had an opportunity to vet, to research, there is a phone call that's memorialized in an email that's never responded to, in which I stated to Ms. McCain, please write into the agreement what we discussed, which was that into the release that the funds would be distributed. I mean, what we have here now is a living plaintiff who, it's a tragedy that he's been denied the benefit of these funds. They could have been doing him some good. $250,000, you know, we're not talking about millions here, but it's a substantial sum of money that his power of attorney could have put to good use. And they, to this day, this is the first time I've ever had this type of request in a nursing home case. I don't understand the purpose behind it, why they are disagreeable to paying him his settlement funds before he leaves the facility. I frankly don't understand it. But on March 5th, I sent an email that wasn't responded to that's part of the record. On March 7th of 2019, are we good here? We're up on the trial call. I'd like to advise that we're settled with the court retaining jurisdiction. No response. And then, of course, on March 8th of 2019, the case is dismissed pursuant to settlement with the court retaining jurisdiction. To address some of the court's questions regarding what happened and transpired on June 10th and then on July 22nd of 2019, I was at both of those arguments in front of Judge Flannery. And some of what transpired on June 10th is reflected in the record on July 22nd. And I think it's somewhat disingenuous that the appellate is suggesting that they were denied the opportunity to file a written response on July 22nd in the transcript. What transpired is that Judge Flannery asked counsel for the appellant on June 10th whether they'd like to file a written response and he decided to argue the motion. That's what happened with the evidence that had been presented by a plaintiff appellee to Judge Flannery in the attachments to the that he was going to grant plaintiff appellee's motion that a request to file a written response was made by the defendant appellate. Also part of that, again, I'm not stating anything that's not reflected in the July 26th transcript, but on June 10th, again as reflected in the transcript from July 22nd, it was suggested that Ms. McCabe would want to be present at any hearing that was held. So then, of course, six, seven weeks later they filed a motion. Ms. McCabe does not appear, which obviously she doesn't have to, but I would actually argue that we had really two evidentiary hearings. The evidence that's out there is what's documented between the parties and the court had opportunity to consider that on both June 10th and July 22nd. On June 10th, there was a suggestion in the appellant's original brief that the court had not gotten courtesy copies and as indicated on July 22nd, Judge Flannery passed the case. He took the time to read the motion and all the attachments and then he heard ample oral argument on the issues that he was presented and made his case. On July 22nd, to my recollection, the only additional piece of evidence that was presented by the appellant was the email that they sent to my partner, Ms. Battersby Black, and the only reason that she was involved at all is because Ms. McCabe and her have a relationship where a lot of times we sit down and discuss many cases at the same time, but I've been the handling attorney on this case from the very beginning, from the time it was filed. So on July 22nd, the court had all of the written documentation and it's important, I think your honors pointed out, that all that was added to that communicator that that evidence was that email that states a request that was relayed to me by Ms. Battersby Black. I told her we would not agree to it and I've been persistent in that position and our position is reflected throughout the entire record. There's nothing in this entire record that suggests the plaintiff, the appellate, the appellee ever agreed that the distribution of the funds would be contingent on him physically leaving the facility or dying or anything else. And, you know, the counsel for the appellate has talked about a couple of facilities that were researched by Symphony, by the appellate. One of them was Chicago Ridge, that facility as your honors pointed out, Mr. Dugan spent a day there and they were horrified, the family was horrified by the was Alden Heather, I believe the name of the facility has changed since then, but she did research it. It was indicated that their overall ratings were below average. For what it's worth, I'm looking at the facility as it's called today right now and it still remains below average for overall rating, much below average on the rating of staffing and below average on quality measures. The best rating it has on Medicare's website is average. There's also transportation considerations for Ms. Dugan, she has to take public transportation, but this is a person and she's very much involved in her brother's care and has been so from the beginning. And she vetted five different facilities in an effort to be reasonable to get him to transfer out of the facility, because I think there is no dispute, all sides would like that, but it was never contingent. The settlement and distribution of the funds was never contingent on that. You know, you said that you sent a, uh, an email on March 7th. Are we good here? We're up for trial tomorrow. We'd like to advise the court that it's settled. You said that you didn't get a response to that, but it says here, it's that Ms McCabe responded. I'm still following up with the facility. Did your client go and complete the application? I don't know if they'll take an old one. And then you responded. She spoke with them. She's on the wait list. If the, um, leaving the facility, uh, wasn't part of the deal, what was that all about? I had a conversation with Ms. McCabe that I was attempting to memorialize on both March, March 5th and March 7th. What she is referring to is just making sure that he's on the waiting list of Holy Family, which I was told by Ms. Dugan, she had taken care of it. Okay. Anybody have anything else? Okay. Mr Howie, you wanna? You got a couple of minutes. Anything you want to reply? Yes, Your Honor. I may have pleased the court. I do want to address a couple of things that Mr Bonamart has referred to. Uh, first is the reference to the, uh, the several court appearances, uh, during which the discussions about, uh, whether the case could be voluntarily dismissed yet were generally postponed and continued as the parties continue to negotiate. What's relevant is that the parties did continue working not just on the language of the settlement agreement, but also on the relocation of Mr Dugan. And that course of conduct that the parties engaged in is relevant to what, at least what Symphony considered to be the terms of the settlement that they had agreed and entered into. The statement back in August made by counsel that the case had settled, I think, is a general statement regarding what the parties believe they had reached. And on most terms, they had reached that. I also think that the record suggests that it didn't appear at that time that it would be a problem or an issue. It only flared up later when the there was no room at the plaintiff's preferred locations and the location that Symphony located was not able, was not acceptable to the plans. So that's a significant aspect. The course of conduct that the parties engaged in and what they what it meant to what they believed they had reached as a settlement agreement. Secondly, I'd like to take a look at the the arguments that Mr. Bonamarte made regarding the the two locations that the plaintiff did reject. And those are embellishments and suggestions and exaggerations of what the record provides. Certainly it's an exaggeration in the case of Chicago Ridge. There is nothing in the record to horrifying about that location. There is the plaintiff's statement or the attorney's statement on behalf of the plaintiff that they had been there before and hadn't liked it. But the notion that it was a horrifying situation, that it was that the conditions were that bad and that it was therefore reasonable to reject it is something that really ought to have been tested in more of an evidentiary hearing rather than the summary decision the Alden facility which Symphony located as a possible transfer place for Mr. Dugan. There is nothing in the record to suggest anything of what counsel has looked at has brought has brought to this court's attention. And that's only underscored by the fact that he's looking at ratings from today or purports to be looking at things that are well outside the record. Not only not in the record from the time of the of the alleged examination into that facility but couldn't possibly have been in the record. This is all irrelevant because not even the appellant has said that they had to take the first available home that would accept them. Obviously the law in this situation to make sure the facility is appropriate facility. So I don't understand your argument at all how that relates in any which way to to what has occurred here. Because no because no party disagrees that reasonableness is part of this settlement agreement. The plaintiff maintains it's all that was part of the settlement agreement regarding relocation. But all parties agree that at a very minimum it had to be reasonable. We don't mean to suggest that any facility had to be accepted sight unseen. But it is certainly unreasonable to reject a facility sight unseen. And the record doesn't suggest that anything more than that happened. Not necessarily. Not necessarily. Could be well if the plaintiff has transportation issues that's a consideration. Looking at the facility on the government website that's a consider. You don't have to in today's world you don't have to visit something when there is available on the internet lots of information about these facilities. So in any event you never said there was any agreement that they had to be visited. So again I don't see how that gets us any further particularly when there was never any request in the record for an evidentiary hearing. To me I don't see where where we go after that. Well where it gets us is this your honor that without an evidentiary hearing whether requested or not the the case law provides that to de novo review. And a de novo review that allows this court to look at what's in the record and all all that the record contains is a statement that the plaintiff quote-unquote looked into it and doesn't want to agree. I don't dispute that all the things that you've suggested the location of the physical location and transportation issues and the ratings that Medicare gives it and all the things that go into any family's decisions you place a loved one in a facility are relevant. But the decision whether or not to transfer him to a place that's been made available and has been located by Symphony has to be reasonable and and to reject it for no no good stated reason is not being reasonable in the view of Symphony. It certainly doesn't. That's speculation in your part because we don't have the transcript from June 10th. We know there was a hearing, we know it proceeded, and we don't have the transcript. So you know again that is your requirement to have that transcript here on your appeal. So we can't imagine what did or did not happen at that hearing. We do know that there was no there were no witnesses taken, there was no evidence taken, and there was evidence there's some documents are presented to the judge so there was some information given to the and if the court is going to look at those documents which is all the court has and that's why the NOVA review is appropriate, it has to consider that the only explanation that's been given for rejecting the Alden facility is that the plaintiff looked into it and doesn't want to agree. And that we maintain is not being reasonable as even the plaintiff maintains is at least the minimal requirements under the agreement between the parties. Mr. Howie, it sounds like what you're saying is is therefore if the client is unreasonable and doesn't leave, you don't have to pay him any money for his injury. That the deal that the case is over. That's what it sounds like you're saying. Not at all Your Honor. Symphony remains under an obligation to pay upon the residents departure from the facility and hopefully that is not because of the resident's demise but I feel certain that would qualify until when the plaintiff moves, Symphony has every intention of promptly paying the settlement amount and Symphony considers itself under an obligation to do that promptly upon the residents departure from the facility for another facility or suitable place. So I would take exception to the notion that Symphony considers itself not under that obligation or doesn't have to pay. Furthermore, the fact that Symphony has worked diligently to locate alternative placement further demonstrates that Symphony is in a sense is trying to pay, is trying to arrange circumstances in the situation and to get Mr. Dugan into a place where Symphony knows that it would be required to make that payment promptly. And so Symphony very much considers itself under that obligation but there is is nothing to suggest that Symphony must comply with its obligations substantially in advance of the time that the plaintiff complies with hers if at all. Okay. Nobody has anything else. Thank you very much. I And we'll be taking it under advisement and you'll be hearing from us shortly. Thank you.